## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL A. CHAPLICK,<br>Administrator of Estate of<br>Michael J. Chaplick, | : <br> : <br> : <br> : | |
| Plaintiff | : | **No. 3:13-CV-0745** |
| | : | |
| vs. | : | **(Judge Nealon)** |
| | : | |
| CAROLYN W. COLVIN,[1] Acting<br>Commissioner of Social Security, | : <br> : | FILED<br>SCRANTON |
| | : | AUG 2 6 2014 |
| Defendant | : | |

PER_____ DEPUTY CLERK

### MEMORANDUM

On March 22, 2013, Plaintiff, Carol A. Chaplick, as Administrator of the Estate of

Michael J. Chaplick ("Claimant"), filed this appeal[2] under 42 U.S.C. § 405 for review of the

decision of the Commissioner of Social Security denying Claimant's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.

(Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision

of the Commissioner denying Claimant's application for DIB will be affirmed.

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal
Rule of Civil Procedure 25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social
Security Administration denying a claim for social security disability benefits" is "adjudicated as
an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Claimant protectively filed[3] his application for social security disability insurance benefits on
August 7, 2009, and the application was completed on August 26, 2009.  (Tr. 20, 126).[4]  The
application was initially denied by the Bureau of Disability Determination ("BDD")[5] on February
18, 2010, on the basis that, based on finding from seven (7) different medical reports, the
myocardial infarction, intra vena cava filter, deep vein thrombosis ("DVT"), degenerative disc
disease ("DDD"), and chronic obstructive pulmonary disease ("COPD") were only slight
impairments that did not render Claimant disabled and unable to work.  (Tr. 20, 100, 138).

On April 1, 2010, Claimant requested a hearing before an administrative law judge.  (Tr.
20).  A hearing was held on February 24, 2011 before administrative law judge Boini ("ALJ"), at
which Claimant and a vocational expert testified.  (Tr. 20, 61).  Subsequent to the oral hearing,
the record was kept open for additional medical evidence development.  (Tr. 20).  On June 10,
2011, the ALJ issued a decision denying Claimant's application because, as will be explained in
more detail infra, Claimant could perform sedentary exertional, unskilled work such as that
performed by a visual inspector, a bench assembler, and a surveillance monitor.  (Tr. 30, 31).

On July 29, 2011, Claimant filed a request for review with the Appeals Council; however,
on July 12, 2012, Claimant died of acute cardiac arrest due to adverse effects of drugs before his

---

3. Protective filing is a term for the first time an individual contacts the Social Security
Administration to file a claim for benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of
the Answer on May 23, 2013.  (Doc. 5).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates
applications for disability insurance benefits on behalf of the Social Security Administration.

appeal took place. (Tr. 12-14, 16). Claimant's death certificate was issued on July 16, 2012. (Tr. 13). On July 20, 2012, Plaintiff was granted Letters of Administration over Claimant's Estate, becoming Administrator of his Estate. (Tr. 8). On October 11, 2012, Plaintiff, as Administrator of Claimant's estate, signed a Notice of Substitution of Party upon Death of Claimant. (Tr. 6). On January 23, 2013, the Appeals Council concluded that there was no basis upon which to grant Claimants's request for review. (Tr. 2). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint in this Court on March 22, 2013. (Doc. 1). On May 23, 2013, Defendant filed an Answer and Transcript from the Social Security Administration ("SSA") proceedings. (Docs. 4 and 5, respectively). On June 28, 2013, Plaintiff filed a Motion to Remand to the SSA Appeals Council. (Doc. 6). Plaintiff filed her brief in support of her complaint on July 5, 2013. (Doc. 7). On July 23, 2013, Judge Caldwell issued an Order denying Plaintiff's motion to remand. (Doc. 9). Defendant filed his brief in opposition on August 6, 2013. (Doc. 10). Plaintiff did not file a reply brief, and the appeal became ripe for disposition on August 20, 2013. The case was reassigned to the Undersigned on November 20, 2013.

Disability insurance benefits are paid to an individual if that individual is disabled[6] and

---

6. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

insured, that is, the individual has worked long enough and paid social security taxes. The last

date that a claimant meets the requirements of being insured is commonly referred to as the date

last insured. It is undisputed that Claimant meets the insured status requirements of the Social

Security Act through December 31, 2014. (Tr. 22).

Claimant was born in the United States on April 24, 1962, and at all times relevant to this

matter was considered a "younger individual"[7] whose age would not seriously impact his ability

to adjust to other work. 20 C.F.R. §§ 404.1563(c); (Tr. 29).

Claimant obtained his GED, completed one (1) year of college, and can communicate in

English. (Tr. 89, 152, 158, 539-540). His employment records indicate that he held the

following jobs: (1) utility worker, which is defined by the Dictionary of Occupational Titles

("DOT") as a medium, semiskilled job; (2) press worker, which is a light, unskilled job; (3) sales

stocker cashier, which is a medium, semiskilled job; (4) quality control and machine operator,

---

which exists in the national economy, regardless of whether such work
exists in the immediate area in which he lives, or whether a specific job
vacancy exists for him, or whether he would be hired if he applied for
work. For purposes of the preceding sentence (with respect to any
individual), "work which exists in the
national economy" means work which exists in significant numbers either
in the region where such individual lives or in several regions of the
country.

42 U.S.C. § 423(d)(2)(A).

7. The Social Security regulations state that "[t]he term younger individual is used to denote an
individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger
person. If you are a younger person (under age 50), we generally do not consider that your age
will seriously affect your ability to adjust to other work. However, in some circumstances, we
consider that persons age 45-49 are more limited in their ability to adjust to other work than
persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§
404.1563(c).

which is a medium, semiskilled job; and (5) an order picker and loader, which is a medium, unskilled job. (Tr. 89).

The records of the Social Security Administration reveal that Claimant had earnings in the years 1978 through 2009. (Tr. 134). His annual earnings range from a low of no earnings in 1995 to a high of $30,757.08 in 2008. (Tr. 134). His total earnings during those thirty-one (31) years were $309,450.00. (Tr. 134).

Claimant asserted that he became disabled on July 10, 2009,[8] while working at Tension Envelope as a utility worker, because of both physical and mental problems. (Tr. 138, 153). The impetus for his claimed disability is a combination of a myocardial infarction, an intra vena cava filter, DVT, cervical DDD, varicose veins, arthritis in his lumbar region, and COPD. (Tr. 100).

At the administrative hearing, Claimant alleged the following combination of physical problems prevented him from being able to work since July 2009: (1) shortness of breath and chest pain due to his heart problems and COPD; (2) pain in his legs as a result of varicose veins in his lower extremities; (3) pain in his upper back from the DDD; (4) pain in his lower back from arthritis; (5) numbness in his right hand due to the DDD; and (6) pain associated with those impairments during activities such as walking, sitting and driving. (Tr. 68-74, 77, 78, 84, 92, 153). He also claimed that the treatments for his COPD, including Albuterol and Symbicort, and for the constant pain, including Ultram and Vicodin, caused memory lapses that impeded his ability to function and sleep. (Tr. 75, 188-189). The mental impairments alleged were Bipolar Disorder Type II, Anxiety, and Depression. (Tr. 188-190).

In a document entitled "Function Report - Adult" filed with the Social Security

---

8. Claimant was forty-seven (47) years of age on his alleged disability onset date.

Administration in November, 2009, and during his testimony at the administrative hearing, Claimant indicated that he moved in with his mother in 2008 and resided with her until his death in 2012 because of his pain and memory lapses. (Tr. 75, 188, 190). Claimant did not have a spouse, children, or animals. (Tr. 189). He avoided exerting himself because of the pain it caused. (Tr. 188). He drove two (2) to three (3) miles at a time because of the medications he was taking and because more than that caused too much pain in his back and groin. (Tr. 77). Aside from his brother taking out the garbage, Claimant's mother performed all other household chores, including cooking, cleaning, paying bills, shopping, and laundry (Tr. 80, 188, 189, 191). Socially, in addition to having friends over a few times a week to play cards, Claimant would watch tv and use the computer. (Tr. 192). In the function report, when asked to check items which his "illnesses, injuries, or conditions affect," Claimant did not check sitting, talking, hearing, seeing, using hands, or getting along well with others. (Tr. 193). Claimant was taking the following medications at the time he completed the function report: Albuterol, Clobex, Symbicort, Ultram, Vicodin, Paxil, Mobic, Aspirin, Amoxicillin, Promethazine, Ventolin, Valturna, Chantix, Vitamin D, Vitamin B12, Citalopram, Temazepam, and Crestor. (Tr. 196, 219, 223).

Claimant registered with the Office of Vocational Rehabilitation ("OVR") on approximately July 24, 2009. (Tr. 226). However, on February 23, 2011, the OVR closed his case based on review of Claimant's medical evidence, functional limitation factors, and his inability to successfully complete a trial work experience or extended evaluation. (Tr. 224, 226). More specifically, the OVR stated that Claimant would be likely to experience difficulties working in the following positions: mail carrier, warehouse laborer, customer service, or home

6

health care aid.  (Tr. 225).

## MEDICAL RECORDS

Before the Court addresses the ALJ's decision and the arguments of counsel, Claimant's relevant medical records will be reviewed in detail, beginning with records that predate Claimant's alleged disability onset date of July 10, 2009.

The first documents encountered in the transcript from the hearing are from Walter W. Setlock, M.D., a physician with the Integrated Medical Group, P.C. located in Frackville, Pennsylvania, and include progress notes, laboratory results, and notes and comments.  (Tr. 245). These documents were requested by Reviewing Physician Vrajlal Popat, M.D. of the BDD for purposes of evaluating the claim.  (Tr. 242).  Dr. Setlock's examination notes date back to April 19, 1999, and state that Claimant's medical conditions at that time included a Pulmonary Embolism ("PE"), a DVT, migraines, COPD, apical myocardial infarction ("MI"), and cardiomyopathy ("CM").  (Tr. 245).

On March 25, 2008, Dr. Setlock saw Claimant for reported pain in his legs, especially when standing for long periods and walking, difficulty falling asleep, and difficulty breathing. (Tr. 277).  Dr. Setlock found multiple varicosities in Claimant's right leg.  (Tr. 277).  In his Assessment, Dr. Setlock stated that Claimant continues to have COPD and hypertension, renewed his Spiriva prescription, and recommended a possible arterial doppler study in the future to assess Claimant's varicosities.  (Tr. 277).

On April 23, 2008, Claimant visited Dr. Setlock due to breathing problems.  (Tr. 276). Dr. Setlock diagnosed expiratory wheezing as a result of COPD, and prescribed Chantix for smoking cessation and Albuterol nebulizer treatments for Claimant's breathing difficulties.  (Tr.

276).

On May 15, 2008, Claimant presented to the Emergency Room ("ER") at Good
Samaritan Regional Hospital for back pain after falling from his bed. (Tr. 298, 306). His
treating ER physician was Sarah Finnerty, M.D. (Tr. 306). His examination noted that he was
anxious, had dull back pain, and that his blood pressure was elevated. (Tr. 301). He received an
x-ray of his thoracic spine and radiograph of his right elbow, which concluded that there was no
gross acute fracture or subluxation of the thoracic spine or the right elbow. (Tr. 306-307).
Claimant was diagnosed with a thoracic sprain, was prescribed Naprosyn, Percocet, and Valium
for the pain and spasms, and was discharged the same day. (Tr. 301-302).

On May 20, 2008, Claimant had an appointment with Dr. Setlock for cervical pain
radiating into his right arm. (Tr. 275). Dr. Setlock's Assessment indicates Claimant experienced
a thoracic sprain, and had elevated blood pressure and cervical spasm. (Tr. 275). As a result, he
suggested Claimant receive a physical therapy evaluation and treatment weekly, and he
prescribed Naprosin and Fexeril for the pain and spasms. (Tr. 275).

On August 25, 2008, Claimant saw Dr. Setlock for his three (3) month follow-up
appointment, and requested pain medicine for his back, shoulder, and arm pain. (Tr. 274). He
also reported that he was experiencing right hand numbness. (Tr. 274). Dr. Setlock reported
Claimant's right hand grip to be intact. (Tr. 274). Dr. Setlock's treatment plan included a
possible future order of an MRI of his C-spine, and he prescribed Vicodin. (Tr. 274).

On August 29, 2008, Claimant underwent an MRI without contrast of his cervical spine at
Schuylkill Medical Center. (Tr. 356). This study concluded that there was no significant interval
changes from a previous MRI study performed on October 24, 2002, and that there was re-

demonstration of DDD at all levels of the cervical spin with disc space narrowing at C5-C6, and C6-C7 and abnormal posterior disc protrusions. (Tr. 356).

On September 19, 2008, Claimant called Dr. Setlock's office requesting a refill on his Vicodin prescription, and reported that he had not yet seen a pain management doctor as suggested by Dr. Setlock. (Tr. 273). On October 8, 2008, Claimant requested a refill of his Albuterol prescription. (Tr. 267). On October 15, 2008, Claimant saw Dr. Setlock for pain that was radiating down his arms from his neck. (Tr. 272). The exam indicated Claimant's blood pressure was high, and Dr. Setlock reported hearing scattered wheezing from COPD that resulted from a tobacco dependency. (Tr. 272). Claimant was prescribed Vicodin for pain and Albuterol for his COPD. (Tr. 272).

On October 27, 2008, Claimant was examined at the Schuylkill Medical Center by Arturo N. Dinicola, M.D. for treatment of his multilevel, bulging disc disease in the cervical region that resulted in severe pain in his neck that radiated into his shoulder and down his right arm to his wrist, right hand numbness and decreased strength. (Tr. 279). He had stated that he had been able to manage the pain with Vicodin and Motrin, but he was still in a great deal of pain. (Tr. 279). He also admitted the he had a prior cervical epidural in October 2002 that provided good relief. (Tr. 279). On examination, Dr. Dinicola stated that Claimant's C5-6 and C6-7 discs were bulging, and this combined with multilevel cervical DDD were causing right suprascapular neuralgia. (Tr. 279). Dr. Dinicola gave Claimant a cervical epidural consisting of lidocaine plus triamcinolone. (Tr. 280). Claimant was then discharged, and told to call Dr. Setlock to discuss further injections. (Tr. 280).

On March 2, 2009, Claimant had an appointment with Dr. Setlock for chest pain and

dyspnea that had been occurring for the two (2) weeks prior to the appointment. (Tr. 271). He had elevated blood pressure, and was again noted to have COPD. (Tr. 272). As a result, Dr. Setlock sent him to the ER for further evaluation, and requested an EKG. (Tr. 272). Claimant was transported from Dr. Setlock's office via ambulance to the Schuylkill Medical Center, and was examined by William Pompella, D.O. for chest pain. (Tr. 271, 308). Upon examination, he indicated that he had intermittent episodes of chest pain that had been occurring for the prior two (2) weeks. (Tr. 283, 310). He indicated that he had been smoking five (5) to six (6) cigarettes a day, was participating in a smoking cessation program, was taking Chantix to aid this process, and that he drank alcohol heavily on the weekends. (Tr. 283). His right leg was noted to have venous stasis. (Tr. 283). An EKG, chest x-ray, and blood work were ordered and performed, and Claimant was admitted to the hospital. (Tr. 312). Claimant's EKG was normal, and his chest x-ray was unremarkable. (Tr. 255, 342). Patient was discharged on March 3, 2009, and was prescribed Aspirin, Capsaicin, and Vicodin for the pain, and Albuterol for his breathing difficulties. (Tr. 281).

On March 4, 2009, Claimant underwent an ECG stress test for his chest pain and CM. (Tr. 331). This test revealed a probable distal inferior wall infarction, with mild to moderate peri-infarct ischemia with an ejection fraction rate of fifty-eight percent (58%). (Tr. 331). On this same date, Claimant also underwent an exercise spect myocardial perfusion study to evaluate his chest pain and palpitations, and the findings of this study were consistent with the ECG stress test findings. (Tr. 348). Claimant also underwent an echocardiogram on March 12, 2009, which revealed mild left atrial dilatation. (Tr. 331).

As a result of this abnormal ECG, Claimant was referred to Cardiologist Rajendra H.

Solanki, D.O., at the Heart Institute at Saint Joseph's Medical Center. (Tr. 340). Dr. Solanki recommended a cardiac catheterization ("cath") procedure because of Claimant's shortness of breath, severe hypertension, and probable coronary artery disease. (Tr. 338, 342). Dr. Solanki prescribed Aspirin for Claimant's probable coronary artery disease, and Crestor and Accupril for hypertension. (Tr. 342). The cath procedure was performed on March 16, 2009 at Saint Joseph's Medical Center, and revealed luminal irregularities, and apical hypokinesis and ballooning of the left ventricle. (Tr. 337-338).

On March 20, 2009, Claimant had a follow-up appointment with Dr. Setlock. (Tr. 270). The assessment from this appointment indicates Claimant suffered from an MI, COPD, a tobacco dependency, and DDD. (Tr. 270). Dr. Setlock gave him prescriptions for Ultram and Vicodin. (Tr. 270).

On March 27, 2009, Claimant had another appointment with Dr. Setlock. (Tr. 268). Dr. Setlock's assessment notes indicated that Claimant's blood pressure was high, and that he was to see a cardiologist in April 2009. (Tr. 268). He noted a dry cough at night, and reported only smoking one (1) cigarette per day. (Tr. 268). Dr. Setlock suggested that Claimant enroll in a smoking cessation program due to his COPD, asthma, and MI, and recommended that he continue taking Chantix. (Tr. 268).

On April 8, 2009, Claimant had an appointment with Dr. Solanki to discuss the tests that had been performed on March 4, March 12, and March 16, 2009. (Tr. 330). Dr. Solanki reported that Claimant remained stable from a cardiac standpoint, but that his blood pressure was high. (Tr. 330, 332). In the impression notes, Dr. Solanki reported that Claimant had a history of hypertension, hyperlipidemia, COPD, chest pain, CM, and dyspnea with exertion. (Tr. 331-332).

Dr. Solanki prescribed Crestor for Claimant's hypertension, and Tekturna. (Tr. 332). He also ordered an MUGA scan, a holter monitor study, and a lipid profile. (Tr. 332).

On May 8, 2009, Dr. Setlock ordered another EKG of Claimant that turned out to be abnormal. (Tr. 253). While there was normal sinus rhythm, there was an inferior MI. (Tr. 253).

On June 1, 2009, Claimant canceled his June 8, 2009 appointment with Dr. Setlock. (Tr. 263). On June 15, 2009, he called for a refill of Vicodin for pain and Clobetasol Propionate for a rash. (Tr. 264). On July 29, 2009, Claimant had an appointment with Dr. Setlock. (Tr. 262). Dr. Setlock's assessment form indicates that Claimant was hypertensive because, according to the Claimant, he drank heavily the night prior to the appointment. (Tr. 262). He also had expiratory wheezing. (Tr. 262). As a result, Dr. Setlock increased Claimant's Terturna dosage to lower his blood pressure. (Tr. 262). Claimant canceled his August 3, 2009 follow-up appointment. (Tr. 261).

On September 1, 2009, Claimant underwent a Holter Monitor test, ordered by Dr. Solanki and performed at Saint Catherine Medical Center, to check for heart arrhythmias. (Tr. 328). This test concluded that the predominant rhythm was normal sinus rhythm, that there were rare premature ventricular contractions, and that there were rare atrial contractions. (Tr. 328).

On September 11, 2009, Claimant called Dr. Setlock's office to report a lump and pain in his groin, and to inquire whether there was a test that could be performed to see what the issue was. (Tr. 257). Dr. Setlock told him that if the pain, lump or tenderness got worse, to go to the ER, and that he would have him set up with a referral with Marylou Rainone, D.O. of Rainone General Surgery for further testing. (Tr. 257).

On September 15, 2009, Claimant had an appointment with Dr. Rainone to evaluate the

swelling and pain in his right groin and buttocks area. (Tr. 374). Dr. Rainone ordered a venous

doppler study of the right femoral area to rule out a pseudoaneurysm. (Tr. 374). On September

17, 2009, this study was performed at Schuylkill Medical Center by Radiologist Gregory J.

Elberfeld, M.D. (Tr. 252). This study, conducted on the right inguinal region, concluded that

there was a right palpable lump in the right groin and right medial thigh corresponding to a large

varicosity that appeared to be supplied by or in communication with the right greater saphenous

vein. (Tr. 252). On September 28, 2009, Dr. Rainone's office notified Claimant of these results,

and instructed him to make an appointment with a vascular surgeon. (Tr. 373).

On October 26, 2009, Claimant had a follow-up with Dr. Setlock. (Tr. 256). The

assessment stated that Claimant's right large inner thigh varicosity was still tender upon

palpitation. (Tr. 256). Dr. Setlock recommended a follow-up appointment for three months from

the date of this appointment. (Tr. 256). He also referred him to vascular surgeon Dr. Bobrowski

per Dr. Rainone's suggestion. (Tr. 386). Additionally, Dr. Setlock filled out a Pennsylvania

Department of Public Welfare form, and indicated that Claimant needed health-sustaining

medication including pain medicine for his DDD and varicosities, cardiac medicines for his intra

vena cava filter and hypertension, and cholesterol medication to prevent a MI and coronary artery

disease. (Tr. 388). He also indicated that based on these medical conditions, Claimant was

temporarily disabled for purposes of employability from a time period of September 19, 2009 to

September 19, 2010. (Tr. 389).

On November 24, 2009, Claimant had an appointment with Dr. Solanki for sharp chest

pain and palpitations. (Tr. 428). He denied having blurry or double vision, trouble swallowing

or speaking, or other complaints. (Tr. 428). His list of medications at that visit included

Vicodin, Aspirin, Crestor, Chantix, Albuterol, Symbicort, Tekturna, and Diovan. (Tr. 428). Dr.

Solanki concluded that a prescription change was necessary to stabilize Claimant's hypertension,

and ordered a future reevaluation of Claimant's apical heart abnormality. (Tr. 430).

On January 2, 2010, Claimant was examined by Robert J. Vigderman, M.D. from the

U.S. Healthworks Medical Group on behalf of the BDD. (Tr. 393-404). In his notes, Dr.

Vigderman discussed all of the aforementioned medical history, and then performed his own

examination in order to aid the process of determining Claimant's disability application.  His

functional exam summary stated the following:

> There are no restrictions of patient's ability to perform work-related
> physical activities.  There are no clinical signs of restricted range of
> motion.  There is no clinically consistent evidence of restriction of
> function.  The patient's subjective report of dyspnea on exertion cannot be
> explained either by cardiac studies given to me nor physical exam.  There
> are no signs of chronic lung disease on the examination.  Although he may
> have a distal right arm paresthesia, this certainly cannot be explained
> medically.  It is not consistent with his explanation of pinched nerve nor
> can it explain the elbow or shoulder pain, which I find inexplicable.  It is
> certainly not neurologic, and I see no evidence of any arthritides.  I find it
> difficult to believe that he has a disuse problem of his right hand in that we
> witnessed him light up and smoke a cigarette with it just after leaving the
> office.  He held the cigarette gently and dexterously as he used it to bring it
> to his lips.  Certainly, anyone with a numb hand would be reluctant to hold
> a flame in it.  In addition, [because] he was able to sit up on the table,
> swinging his legs up and holding his body in a "V" as he did this, [this]
> would certainly preclude any complaint of a chronic spinal pain.

(Tr. 396-397).  He also concluded that, based on his examination, Claimant would have no

limitations lifting, carrying, standing, walking, sitting, pushing, or pulling. (Tr. 397-399).  He

found that there were no limitations on postural activities or other physical functions, and that

there were no environmental restrictions. (Tr. 399).

On January 6, 2010, Claimant had his first appointment with Dr. Garsharan Singh, M.D.

for his underlying medical issues, including the varicosities in his right leg, COPD, DDD and hypertension. (Tr. 435). Claimant visited Dr. Singh again on March 8, 2010, and May 10, 2010, complaining of chronic neck pain. (Tr. 434). With regards to Dr. Singh's treatment plan or any diagnosis, his notes are illegible. (Tr. 434-435).

On March 24, 2010, Dr. Setlock ordered a cartoid artery ultrasound for Claimant's blurred vision and headaches. (Tr. 425). This test revealed no specific sonographic evidence of hemodynamically significant cartoid artery stenosis. (Tr. 425).

On March 25, 2010, Dr. Singh ordered blood work, including a complete blood count ("CBC"), vitamin D panel, and lipid panel. (Tr. 439-441). This blood work revealed a high MCV and high MCB, and a low platelet count. (Tr. 441).

On April 6, 2010, Dr. Setlock ordered blood work, including a CBC, that was performed at Schuylkill Medical Center. (Tr. 423). This blood work revealed a low red blood cell count, a low hemoglobin, low hematocrit, a high MCV, high MCB, and a low platelet count. (Tr. 423).

On April 30, 2010, Dr. Setlock sent Claimant to the Schuylkill Medical Center for "PVR" testing for his varicosities. (Tr. 424). The test revealed normal resting arterial circulation bilaterally. (Tr. 424).

On May 25, 2010, Dr. Singh sent a letter to Claimant stating that he would no longer be able to treat him as a patient as of June 25, 2010. (Tr. 432).

On June 15, 2010, Claimant visited a physician with Marshall-Reismiller and Associates because of pain in his right leg that radiated from his buttocks down his entire leg. (Tr. 415). Two months later, on August 26 2010, Claimant had a second appointment with a physician at Marshall-Reismiller and Associates due to heaviness and pain in his right leg. (Tr. 413).

15

Claimant requested, and received, a refill for his Vicodin prescription. (Tr. 413). The physician ordered blood work, including a CBC and a lipid panel, with all results coming back in the normal range. (Tr. 416-417).

On November 8, 2010, Claimant again visited a physician at Marshall-Reismiller and Associates because of what he described as weak breathing, chest congestion, and a non-productive cough. (Tr. 412). Claimant also requested "something stronger than Vicodin" for his pain in his legs. (Tr. 412). The physician prescribed prednisone and phenergan for Claimant's lung symptoms, and Vicodin for the pain. (Tr. 412). Blood work was ordered and performed on November 8, 2010, including a CBC count and a lipid panel, and all results were within normal range. (Tr. 416-417).

On December 29, 2010, Dr. Cynthia Lubinsky ordered blood work to test for Hepatitis A, B, and C. (Tr. 418). The test was performed that same day by Quest Diagnostics, and the results were negative for findings of all three (3) types of Hepatitis. (Tr. 418).

On February 8, 2011, Claimant had an appointment with a psychiatrist and therapist at Child and Family Support Services ("CFSS"). (Tr. 442). He reported that he had been experiencing anxiety, depression, an inability to focus, and memory problems due to his aforementioned physical health issues. (Tr. 442). He reported that he had a problem with substance abuse, namely alcohol, that he received inpatient treatment for in 2000. (Tr. 443-444). He denied being involved in any type of physical, sexual or domestic abuse or violence. (Tr. 444-445). He asserted that his strengths and assets were a supportive family, stable housing, and his compliance with medication. (Tr. 447). In terms of his clinical symptoms, Claimant indicated that he experienced angry moods, was evasive, had impoverished thinking, had

jealousy and suspicion issues, had ruminative worries, had impaired judgment, memory and concentration, was depressed, manic, anxious, obsessive compulsive, impulsive, and prone to panic attacks, had low self-esteem, was overly critical of himself, had appetite disturbances, low energy, bizarre behavior, and ideations, and experienced headaches. (Tr. 447). When asked if he had any special needs in order to participate, he responded that he needed to be able to "stand off and on" during treatment. (Tr. 447). He was diagnosed at this appointment with Anxiety and Bipolar Affective Disorder Type II, and was referred to counseling for treatment. (Tr. 449-450).

On February 10, 2011, Dr. Lubinsky ordered a Pulmonary Function Test, which was conducted by James Fitzpatrick, D.O. (Tr. 457). The test concluded that the FEV-FVC rate of fifty-seven percent (57%) suggested obstructive airway disease, with mild obstruction in the large airways, and severe obstruction in the small airways. (Tr. 457).

On February 28, 2011, Claimant received a script from Dr. Lubinsky of Marshall-Reismiller and Associates for a crutch and a cane for the diagnosis of arthritis. (Tr. 454). On March 7, 2011, he received a script for Adderal, Citalopram, Lamotrigine, and Temazepam from Jopindar Harika, M.D. at CFSS. (Tr. 455).

On April 22, 2011, Claimant presented to the Schuylkill Medical Center after falling ten (10) to fifteen (15) feet down through a trap door at an establishment where he was drinking alcohol. (Tr. 462). He did not lose consciousness or pass out, but he did hit his head. (Tr. 462). He denied any history of headaches, significant neck pain or aches, numbness or tingling, trouble breathing, or abdominal pain. (Tr. 462). He stated that he did have bilateral knee pain. (Tr. 462). A CAT scan of his head and neck was performed, and were negative for fractures, but positive for bilateral maxillary sinusitis. (Tr. 464). X-rays of both of his knees and left ankle

also did not show any fractures. (Tr. 462). Claimant was diagnosed with a left ankle sprain, and lacerations of his right knee and the inside of his mouth. (Tr. 462). He was advised by Muhammad Saifullah, M.D. to rest, ice, and elevate his legs where they were injured. (Tr. 463). He was also prescribed Keflex to prevent secondary infections. (Tr. 463).

On April 26, 2011, due to continued pain after the fall, Claimant had an appointment with Dr. Guastavino at the Orthopedic Associates of Pottsville. (Tr. 472, 487-488). His past medical history at this point indicated that he suffered from varicosities, COPD, had a Greenfield filter from a DVT in his right leg, had DDD, MI, COPD, asthma and hypertension. As a result of the pain in Claimant's left leg, Dr. Guastavino ordered a CT scan of both of his knees, left ankle and his foot. (Tr. 473).

On April 29, 2011, Claimant had a repeat CT scan of his left knee at the Schuylkill Medical Center. (Tr. 470, 489-490). This CT scan found a comminuted fracture of the lateral tibial plateau with displace loose joint ossific fragments, a small avulsion fracture of the posterior lateral aspect of the medial tibial plateau, and a nondisplaced fracture of the proximal left fibula. (Tr. 470, 489-490).

On May 3, 2011, Claimant again saw Dr. Guastavino, who reviewed the findings of the April 29, 2011 CT scan, and referred Claimant to a Tertiary Center for treatment of his knee. (Tr. 474). At this visit, he claimed to have neck pain, with pain radiating into his arms, and was referred back to Dr. Weiss who had treated him for this problem already. (Tr. 474).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91

(3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime

Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ concluded that Claimant met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 22). The ALJ then proceeded through each step of the sequential evaluation process and determined that Claimant is not disabled. (Tr. 31).

At step one, the ALJ found that Claimant had not engaged in substantial gainful work activity from his alleged onset date of July 10, 2009, through his date last insured, December 31, 2014. (Tr. 22).

At step two, the ALJ determined that Claimant suffered from the severe[9] combination of impairments of the following: "myocardial infarction (MI); chronic obstructive pulmonary disease (COPD); asthma; hypertension (HTN); and degenerative disease of the cervical and lumbar spines (20 C.F.R. 404.1520(c))." (Tr. 22).

At step three of the sequential evaluation process, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 23).

---

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

At step four, the ALJ determined that Claimant had the residual functional capacity

("RFC") to perform less than a full range of sedentary work.[10] (Tr. 23-24).  Specifically, the

ALJ stated the following:

> [T]he [C]laimant can lift and/ or carry at most 10 pounds occasionally and
> 5 pounds frequently; can perform a job in a seated position with the
> opportunity to arise from a seated position on a self-directed basis to
> alleviate stiffness and pain in the lower back and also for relaxation from
> the seated position to alleviate any fluid build-up in the legs or pressure;
> can perform a variety of work that is unskilled in nature in a job setting
> that is not subject to frequent changes; generally has the capacity to engage
> in lateral reaching and fine motor dexterous coordination, fingering,
> feeling, and handling, on a frequent basis bilaterally, but should not
> engaged in any repetitive rotation, flexion or extension of the neck or any
> more than occasional overhead reaching; is restricted from any work
> settings that would subject him to concentrated exposure to any respiratory
> irritants and also poorly ventilated work environments or settings as
> described from a vocational standpoint in the Dictionary of Occupational
> Titles (DOT).

(Tr. 23-24).

At step five of the sequential evaluation process, the ALJ determined that there were jobs

in significant numbers in the national economy that Claimant could have performed.  (Tr. 30).

Thus, the ALJ concluded that Claimant was not under a disability as defined in the Social

Security Act at any time between the alleged onset date of July 10, 2009, and the date last

---

10. The Social Security regulations define sedentary work as follows:

> (a) Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a
> time and occasionally lifting or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as one which involves sitting, a
> certain amount of walking and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are required occasionally and
> other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a) and 416.967.

insured, December 31, 2014.  (Tr. 31).

## DISCUSSION

On appeal, Plaintiff alleges that Claimant should have been awarded disability benefits for the following reasons: (1) he was disabled because his COPD, DDD, depression, Bipolar Disorder, anxiety, feelings of worthlessness and helplessness, alcoholism, PE, CAD, DVT, hyperlipidema, migraines, asthma, and occasional hand numbness met the requisite impairment listings criteria; (2) the ALJ's analysis of Claimant's RFC was incorrect; (3) the application should have been reviewed in relation to the older age category; (4) ALJ Boini was potentially intoxicated during Claimant's hearing or while reviewing his case; and (5) Claimant was eventually awarded benefits based on a second application.

In response to these allegations, Defendant asserts that substantial evidence supported the ALJ's decision that Claimant was not disabled under the Act.  (Doc. 10, p. 2).  More specifically, Defendant alleges that substantial evidence supports (1) the ALJ's finding that neither Claimant's physical nor mental impairments satisfied the corresponding impairment listings; and (2) the finding that Claimant's RFC allowed him to work in a sedentary job as long as he was not required to lift more than ten (10) pounds.  (Doc. 10, pp. 14-23).  Furthermore, Defendant asserts that the VE's testimony provides substantial evidence supporting the ALJ's non-disability finding, that the ALJ appropriately found that Claimant was a "younger person" under the regulations, that Claimant's subsequent award of benefits for a different time-period is not relevant to the case, and that there is no evidence that the ALJ, who was terminated in part for being intoxicated while working, was intoxicated while deciding Claimant's application.  (Id. at 24-28).

24

1.   **Impairment Listings**

Plaintiff alleges that Claimant was entitled to disability benefits due to the following medically-supported impairments that met the requisite impairment listing: (1) severe depression resulting in diminished pleasures in activities and overindulgence, impairment listing 12.04; (2) Bipolar Affective Disorder, Type II, impairment listing 12.04; (3) anxiety, impairment listing 12.06; (4) feelings of worthlessness and hopelessness, impairment listing 12.04-1f; (5) past alcohol dependence, impairment listing 12.09; (6) multilevel DDD, impairment listing 1.04; (7) COPD, impairment listing 3.02a; (8) pulmonary embolism; (9) coronary artery disease; (10) DVT; (11) MI; (12) hyperlipidemia; (13) migraines; (14) severe, uncontrolled asthma; and (15) occasional hand numbness.  (Doc. 1, pp. 4, 6-8).  Plaintiff alleges that the evidence relied upon by the ALJ does not support his finding that Claimant was not disabled because the evidence supported the impairments.  (Doc. 1, pp. 4, 6-8); (Doc. 7, p. 6).

To qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to an impairment listing, Plaintiff bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment."  Sullivan v. Zebley, 493 U.S. 521, 531 (1990).  Meeting only some criteria of a listing, "no mater how severely, does not qualify."  Id. at 530.  Moreover, for a claimant to prove that his impairment is equivalent to a listing, he must "proffer medical findings which are equal in severity to all the criteria for the one most similar listed impairment."  Stremba v. Barnhart, 171 F. App'x 936, 938 (3d Cir. 2006) (citing Sullivan, 493 U.S. at 530).